IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Donzell Thomas, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 18-cv-4311 |
| | ) |
| Randy Pfister, et al. | ) |
| | ) |
| Defendants. | ) |

Memorandum Opinion and Order

Plaintiff Donzell Thomas brings the instant action claiming that he received constitutionally inadequate medical care because he was denied sufficiently tinted eyewear for his injured, light-sensitive eye while an inmate at Stateville Correctional Center ("Stateville"). Defendant Timothy Fahy, O.D., has moved for summary judgment [115]. For the reasons that follow, Dr. Fahy's motion is granted in part and denied in part.

I.

Due to a gunshot injury sustained in 1984, Mr. Thomas suffers from optic nerve damage. ECF No. 119-1 at 19:13-18. A symptom of that damage is that one of Mr. Thomas's pupils is larger than the other, which causes Mr. Thomas to be hypersensitive to light. ECF No. 119-2 at 111:15-21, 113:4-7. Light sensitivity, if left

untreated, can result in headaches and discomfort for the patient. *Id.* at 148:7-10. There is no pharmaceutical or surgical fix for light sensitivity--rather, the treatment is to wear tinted or Transitions (photochromic) lenses "to cut down the amount of ultraviolet light and some of the normal light entering" the eye. *Id.* at 112:13-23.

To treat his injury, Mr. Thomas wore wire-frame Transitions lenses until he became incarcerated with the Illinois Department of Corrections ("IDOC"). ECF No. 119-1 at 21:9-22:5. In 2011, Mr. Thomas's glasses were replaced with consistently tinted Eagle-frame glasses, which he received while at Stateville. *Id.* at 22:2-11, 150:20-23. Unfortunately, however, those glasses were broken during an institutional "shakedown" in or around 2013--both arms snapped and the lenses became scratched to the point of limiting visibility. *Id.* at 14:21-24; 129:8-9; 152:4-7. Mr. Thomas contends that he complained about his broken glasses, including to prison optometrists, starting 2013, but was unsuccessful in obtaining a replacement pair. ECF No. 7 ¶¶ 18-19. In the meantime, although tape is technically considered prison contraband at Stateville, Mr. Thomas was able to tape the arms onto his glasses and continue wearing them, except during an approximately six-month period in 2018, when the tape was confiscated and he was unable to obtain replacement tape. ECF No. 119-1 at 130:10-11; 132:11-133:6; 152:8-15.

Dr. Fahy, an optometrist, first began working for Wexford Health Sources, Inc. ("Wexford"), the private company that provides inmate medical care at Stateville and other prisons, in October 2016. ECF No. 125 ¶ 2. On December 5, 2016, Mr. Thomas visited Dr. Fahy, and Dr. Fahy prescribed Mr. Thomas a pair of large Nate-frame (hard-frame) glasses with "Transitions grey" lenses which he noted was for "UV protection / photophobia." ECF No. 119-2 at 115. Mr. Thomas did not immediately receive those glasses, however. At Stateville, prescriptions for both Transitions lenses and "Nate" hard-frame glasses must be sent for collegial review to the medical director of Wexford. *Id.* at 38:18-39:4, 66:11-67:23.

On or about December 22, 2016, the optometry nurse, Kara Matakiewicz, showed Dr. Fahy an email from Bill Shevlin with Stateville Intelligence. ECF No. 125 ¶ 6. Mr. Shevlin had been asked whether Mr. Thomas and a list of other inmates who had been prescribed hard Nate frames and/or Transitions lenses would be able to order those glasses in light of prison security considerations. *Id.* He replied, "We do not approve of the plastic frames because there is metal inside the frame. The transition lenses do not apply here since the inmates are locked in their cells for 23 hours a day, also this can constitute in concealment of their identity." ECF No. 119-2 at 117 (emphasis in original).

3

On January 11, 2017, after seeing this email and without setting up another appointment with Mr. Thomas or otherwise informing him, Dr. Fahy changed Mr. Thomas's prescription to a standard rubber "Eagle"-frame pair of glasses with clear plastic lenses, citing "safety issues" with the previous prescription. ECF No. 119-2 at 116, 118. Those glasses were delivered to Mr. Thomas, but he returned them on May 31, 2017 because (1) they were not tinted or Transitions lenses, and (2) they were too small to fit his face. ECF No. 125 ¶ 20. When Mr. Thomas returned the glasses, Dr. Fahy's notes indicate that he offered to order Mr. Thomas a larger rubber frame with clear lenses, but Mr. Thomas declined. ECF No. 119-2 at 120. Mr. Thomas denies that he declined the larger glasses. ECF No. 119-1 at 55:5-9. Dr. Fahy's notes also indicate that he offered Mr. Thomas Solar Rolz, which are made of a thin, tinted, rollable plastic and can be worn underneath a pair of glasses. ECF No. 119-2 at 120; ECF No. 119-2 at 80:3-23. Solar Rolz are commonly handed out at the eye doctor after a patient's pupils have been dilated. *Id.* at 80:3-11. Mr. Thomas declined the Solar Rolz because he still had possession of his taped and scratched prescription tinted glasses from 2011, which he judged to be more helpful than the Solar Rolz would be. ECF No. 119-1 at 56:6-14.

On September 18, 2017, Dr. Fahy examined Mr. Thomas again, and noted that he presented with photophobia, or light sensitivity.

4

ECF No. 119-2 at 121. He filled out a medical services referral and report requesting Transitions grey lenses for Mr. Thomas's photophobia. *Id.* at 133. On October 25, 2017, the Wexford medical director approved Transitions lenses for Mr. Thomas after a collegial review. *Id.* at 134. Dr. Fahy prescribed Mr. Thomas large-frame "Eagle Master" rubber glasses with "Transitions grey" lenses on November 6, 2017. *Id.* at 122. The order went through and the new glasses were sent to Stateville on November 13. ECF No. 125 ¶ 29.

On June 21, 2018, Mr. Thomas initiated the instant lawsuit. ECF No. 1. On July 23, 2018, Mr. Thomas saw Dr. Fahy again. ECF No. 119-2 at 124. Dr. Fahy's notes provide that Mr. Thomas reported photophobia even with the new glasses because the lenses were not darkening. *Id.* He wrote, "Patient reports photophobia in <u>all</u> lighting," and "Patient states that new spectacle lenses 'do not darken in sunlight.' Patient requests tint for indoor lighting; constant wear." *Id.* (emphasis in original). Dr. Fahy thought it was possible the lenses were defectively manufactured, but because Mr. Thomas did not bring the glasses to the appointment, Dr. Fahy was unable to inspect them himself. *Id.* at 126:18-127:13. A few months later, however, on October 31, 2018, a correctional officer was able to bring Mr. Thomas's spectacles to the clinic. *Id.* Dr. Fahy brought the glasses outside so they could be illuminated by direct sunlight, and he observed the

5

glasses darken to what he guessed was approximately 60% light blockage. *Id.* at 125.

On January 7, 2019, Mr. Thomas again came to see Dr. Fahy, complaining again about photophobia with his current glasses. *Id.* at 126. Dr. Fahy's notes provide: "indoor lighting does not activate PGX [photo grey extra transitional lenses] enough to provide relief for patient." *Id.* at 134:19-135:3; 126. Dr. Fahy prescribed eye drops, but did not address Mr. Thomas's chief complaint regarding his glasses. *Id.* at 137:2-16.

On June 19, 2019, this court denied in part Wexford's and Dr. Fahy's motions to dismiss. ECF No. 54. Soon thereafter, in July 2019, Dr. Fahy recalls that the Stateville facility medical director, Dr. Henze, came to tell him personally that they had just gotten "approval for Mr. Thomas to have a Nate frame, which is a plastic, more sturdy frame . . . . And he was going to get his permanently-tinted lenses." ECF No. 119-2 at 62:12-16, 141:12-19. Dr. Fahy filled out an optical prescription order on July 31, 2019 for tinted hard Nate-frame spectacles for Mr. Thomas. *Id.* at 128. Mr. Thomas received those glasses in 2019 and has been satisfied with them. ECF No. 119-1 at 59:6-16.

## II.

"Summary judgment is proper if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *McDaniel v. Progress*

6

*Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "We 'consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in' that party's favor." *Id.* (citing *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018)).

Mr. Thomas sued Dr. Fahy both in his individual capacity and in his official capacity as an employee of Wexford, "which is tantamount to a claim against Wexford." ECF No. 54 at 8. I turn first to the individual-capacity claim.

"Deliberate indifference to a prisoner's serious medical needs may constitute cruel and unusual punishment under the Eighth Amendment." *Hildreth v. Butler*, 960 F.3d 420, 425 (7th Cir. 2020) (citing *Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019)). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016). Negligence or recklessness is not enough; a prison official acts with deliberate indifference when "an official actually knew of and disregarded a substantial risk of harm." *Id.* at 728 (emphasis omitted).

7

Here, Dr. Fahy does not argue that Mr. Thomas was not suffering from an objectively serious medical condition. He does contend, however, that Mr. Thomas does not offer any "verifying medical evidence" that the delay in his receiving sufficiently tinted glasses[1] caused him any harm. ECF No. 117 at 7. It is true that Mr. Thomas must "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (emphasis removed) (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996)). Here, however, the record includes such evidence. Dr. Fahy observed personally that one of Mr. Thomas's

---

[1] Dr. Fahy points out that Mr. Thomas was newly in possession of the rubber-frame Transitions glasses Dr. Fahy prescribed at the time he initiated the lawsuit in 2018, and Mr. Thomas averred in the complaint that the lenses did not transition "at all." ECF No. 7 ¶ 36. As the litigation progressed, Mr. Thomas changed course and began asserting that the glasses transitioned to some extent, but they did not transition sufficiently to meet his needs. Dr. Fahy argues that by failing to amend his complaint to that effect, Mr. Thomas forfeited the argument. ECF No. 117 at 2-4. I disagree. Medical records from approximately the time the lawsuit was initiated in summer 2018 suggest that Mr. Thomas did not believe then that the lenses transitioned--and Dr. Fahy had not yet tested them by holding them up to the sunlight. ECF No. 119-2 at 124-25. While it is true that a plaintiff may not amend his complaint through a brief in opposition to a motion for summary judgment, "that caselaw is entirely beside the mark where (as here) the facts have been fully developed through discovery and a party is then really engaged in nothing more than the essential equivalent of amending the pleadings to conform to the evidence." *Umar v. Johnson*, 173 F.R.D. 494, 503 (N.D. Ill. 1997); *see also Ash v. Wallenmeyer*, 879 F.2d 272, 274 (7th Cir. 1989) ("The federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process.").

8

pupils was more dilated than the other, which he noted correlates to light sensitivity. ECF No. 119-2 at 111:17-21, 113:4-7, 121. Mr. Thomas complained that lack of access to the spectacles he needed to correct his light sensitivity caused dry eyes and migraines. *See, e.g.*, ECF No. 119-1 at 62:22-63:5. Dr. Fahy admitted that Mr. Thomas complained to him about headaches, and that headaches are a symptom of untreated light sensitivity. ECF No. 119-2 at 183:1-7. And Dr. Fahy also testified that subjective complaints of headaches and discomfort are the only possible evidence of photophobia-induced migraines: "Nothing as far as objective signs. Wouldn't be able to look into a patient's eye and see repercussions from [light] exposure." *Id.* at 148:7-13. Accordingly, there is evidence in the record that the delay in treatment "unnecessarily prolonged and exacerbated" Mr. Thomas's migraine-related pain. *See Grieveson*, 538 F.3d at 779 (citing *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007)). That is sufficient. *See, e.g.*, *id.* (issues of fact precluded summary judgment where prison delayed inmate's medical treatment 1.5 days after learning he had broken nose).

Dr. Fahy next argues he was not deliberately indifferent to Mr. Thomas's medical needs. First, Dr. Fahy contends that each and every pair of glasses he prescribed to Mr. Thomas--including the pair with clear lenses--included protection against ultraviolet ("UV") light. ECF No. 117 at 5. That argument is not

9

well taken. There is no evidence in the record that UV protection alone would have been sufficient to treat Mr. Thomas. Dr. Fahy himself said in his deposition that the recommended treatment for Mr. Thomas's condition would be "getting something like darker tint or Transitions lenses to cut down the amount of ultraviolet light *and some of the normal light* entering [the eye]." ECF No. 119-2 at 112:13-19 (emphasis added). Moreover, Dr. Fahy's notes reflect that Mr. Thomas complained that the Transitions lenses Dr. Fahy prescribed--which had UV protection--did not darken sufficiently "to provide relief" from his headaches. *Id.* at 126. Dr. Fahy testified generally that he "had no reason to not believe" Mr. Thomas's complaints of headaches and light sensitivity. *Id.* at 105:20-22.

Dr. Fahy also contends that IDOC prevented him from ordering Transitions or tinted lenses for Mr. Thomas because of security concerns. ECF No. 117 at 5-6. Mr. Thomas disputes that IDOC prevented him from having the eyeglasses he sought, and claims that security informed him that he was eligible to receive tinted or Transitions spectacles. *See* ECF No. 119-1 at 12:18-14:12. There is evidence in the record, however, that there were security considerations at play--for example, the December 2016 email in which Mr. Shevlin stated that Stateville Intelligence did not approve of hard "Nate" frames and Transitions lenses, which could pose a security risk. ECF No. 125 ¶ 6. Despite these security

concerns, however, Mr. Thomas was issued tinted glasses at Stateville in 2011, he obtained Transitions lenses in late 2017 following a Wexford collegial review, and he received his current pair of tinted Nate-frame spectacles in 2019. Taking all reasonable inferences in favor of Mr. Thomas, as I must at summary judgment, the fact that Mr. Thomas was able to obtain tinted and hard-framed glasses at Stateville three times over a period of eight years suggests that despite any general security policies to the contrary, Wexford was able to prescribe and obtain tinted and/or hard-framed glasses for inmates if necessary. Accordingly, a question of fact remains as to whether Mr. Thomas's treatment delay can be attributed to IDOC's security concerns.

Finally, Dr. Fahy argues that Mr. Thomas cannot show that Dr. Fahy was the proximate cause of any injury. ECF No. 117 at 7-8. Specifically, Dr. Fahy points to Mr. Thomas's refusal to accept the Solar Rolz that Dr. Fahy offered to Mr. Thomas on May 31, 2017. *See* ECF No. 119-2 at 120. Because Mr. Thomas refused the Solar Rolz, he contends, Mr. Thomas was the intervening cause of his own harm, and Dr. Fahy cannot be subject to liability. *See Broadfield v. Williams*, 768 F. App'x 544, 548-49 (7th Cir. 2019) (medical officer was not liable for inmate's injury after inmate stopped taking prescribed medication).

But questions of fact remain regarding whether Mr. Thomas's refusal of the Solar Rolz caused his injury. Solar Rolz are made

11

of a flimsy, rollable plastic, and a jury could find that they would have offered Mr. Thomas nothing but a temporary fix--one that he did not need at that moment because he already had a temporary fix, his broken tinted glasses, waiting for him in his cell. *See* ECF No. ECF No. 119-1 at 56:6-14. Moreover, by the time Mr. Thomas refused the Solar Rolz, it had already been more than five months since Mr. Thomas's initial visit with Dr. Fahy, and Dr. Fahy had already changed his initial order for Transitions lenses. Even if the Solar-Rolz refusal cuts off liability in May 2017, in other words, Mr. Thomas may be able to show deliberate indifference before that point.

Accordingly, a jury could find that Dr. Fahy knew of Mr. Thomas's photophobia and headaches, knew the condition was serious, and nevertheless refused him treatment. I decline to grant summary judgment on the individual-capacity claim against Dr. Fahy.

### III.

Mr. Thomas also brought a § 1983 claim against Dr. Fahy in his official capacity as an employee of Wexford. There is no respondeat superior liability for the actions of an employee of a private corporation acting under the color of state law. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (citing *Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014)). Instead, to support his claim, Mr. Thomas "must

12

show that the violation was caused by (1) an express . . . policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Id.* (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)).

Dr. Fahy argues that Mr. Thomas has not established that there is any Wexford policy, custom, or practice that caused Mr. Thomas's injuries. Mr. Thomas made no attempt to respond or defend his official-capacity claim in his brief in response to Dr. Fahy's motion for summary judgment; accordingly, the official-capacity clam is waived. *See Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018).

Even if it had not been waived, however, summary judgment would have been appropriate on the official-capacity claim. In the complaint, Mr. Thomas alleged that Wexford's relevant policies, practices, and customs included:

A) A failure to properl[y] examine prisoners['] continued need for assistive equipment in accordance with established policies;

B) Failure to properly train, supervise, discipline, monitor, counsel and otherwise control staff in the provision of reasonable accommodations to disabled prisoners[;] and

13

>   C) Failure to accommodate prisoners with medical care that treats and/or alleviates pain, discomfort and stress through the care of Stateville's health care staff and/or outside visits when necessary.

ECF No. 7 ¶ 53. I have seen no evidence in the record, however, of any such widespread custom or practice beyond the circumstances of Mr. Thomas's own experience. "One instance of purported deliberate indifference is not enough to support *Monell* liability resting on a practice or policy." *Johnson v. Wexford Health Source, Inc.*, No. 17-cv-3213, 2020 WL 2128735, at *4 (N.D. Ill. May 5, 2020) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)); *accord Robinson v. Wexford Health Sources, Inc.*, No. 16-cv-6185, 2019 WL 7290849, at *2 (N.D. Ill. Dec. 30, 2019) (collecting cases).

Mr. Thomas did assert during his deposition that Wexford had a policy and practice of limiting care to inmates in an effort to cut costs. *See* ECF No. 119-1 at 44:14-45:24. But Mr. Thomas's evidence for that is scant--he claims that in 2016, Dr. Fahy told him that Nurse Matakiewicz had told Dr. Fahy that Mr. Thomas could not have the lenses he wanted because Wexford had a practice of cost cutting. ECF No. 125 ¶¶ 13-14. He also claims that another nurse named Amy told him that Wexford had a cost-cutting policy. ECF No. 119-1 at 44:22-45:9. This evidence is properly excluded

14

as hearsay.[2] And in any event, when attempting to establish a widespread custom through indirect proof, "a 'plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citation omitted). Mr. Thomas falls short of this standard.

For the foregoing reasons, the motion for summary judgment [115] is granted in part and denied in part. Summary judgment is granted as to the official-capacity claim against Dr. Fahy, but the case may continue against Dr. Fahy in his individual capacity.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: August 24, 2021

---

[2] I cannot consider the evidence as non-hearsay statements of an opposing party's agent or employee under Federal Rule of Evidence 801(d)(2)(D) because, at minimum, it is not clear that Nurse Matakiewicz and Nurse Amy were employed by Wexford. *See* ECF No. 119-2 (Fahy Dep.) at 48:18-49:4 (stating that he is not sure if Nurse Matakiewicz is employed by IDOC or Wexford, and that some nurses are employed by the state and others by Wexford); *see also Hildreth*, 960 F.3d at 428 (upholding decision to exclude affidavit under Federal Rule of Evidence 801(d)(2)(D) because plaintiff "failed to show that the nurses who allegedly made the[] statements were employed by Wexford, and he failed to confirm that the statements were made within the scope of employment").

15